# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

BRADLEY JOHNSON,

      Plaintiff,

v.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 12-2031 (MJD/TNL)

J. B. HUNT TRANSPORT, INC.,

      Defendant.

Clayton D. Halunen and Jacob Frey, Halunen & Associates, and Michelle Dye Neumann, Brian T. Rochel, and Phillip M. Kitzer, Schaefer Law Firm LLC, Counsel for Plaintiff.

George R. Wood, Littler Mendelson, P.C., Counsel for Defendant.

## I.    INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment [Docket No. 31] and Plaintiff's Motion to Strike Declaration of Wesley Griffin [Docket No. 42].  The Court heard oral argument on October 4, 2013.  Because genuine issues of material fact exist, the Court denies summary judgment.  The Court also denies the motion to strike.

## II.    BACKGROUND

### A.    Factual Background

### 1.    The Parties

Defendant J.B. Hunt Transport, Inc. ("J.B. Hunt") is a transportation

logistics company incorporated in the state of Georgia and headquartered in the

state of Arkansas.  (Griffin Decl. ¶ 2.)  The company operates a facility in

Roseville, Minnesota that provides services to Whirlpool Corporation, a

manufacturer of major home appliances.  (Id. ¶ 9.)

Plaintiff Bradley Johnson worked for J.B. Hunt from August 28, 2009, until

December 16, 2010.  (Kitzer Decl., Johnson Dep. 13, 33.)  Johnson drove and

delivered appliances for the Whirlpool account at J.B. Hunt's Roseville facility.

(Id. 12-14.)  Johnson's manager was Jeffrey Henning.  (Id. 14, 18.)

### 2.    J.B. Hunt's Workers' Compensation Claim Protocol

J.B. Hunt's policy is that when a driver is injured while working, the driver

must immediately report the incident to J.B. Hunt's Corporate Claims

Department by telephone.  (Kitzer Decl., Hill Dep. 18-20; Griffin Decl., Ex. 1, J.B.

Hunt 2009 Driver Manual at 71.)  The Corporate Claims Department asks the

driver whether he or she requires medical treatment and whether he or she

would like to file a workers' compensation claim.  (Hill Dep. 19-20.)  If the

employee decides to file a workers' compensation claim, the claim is

administered by J.B. Hunt's workers' compensation coverage carrier.  (Id. 14.)

J.B. Hunt employs three claims examiners who are liaisons between J.B. Hunt and its insurance carrier. (Id. 14-15, 21-22.) The claims examiner responsible for the claims arising out of J.B. Hunt's Roseville location is Christina Hill. (Id. 99.)

    3.    **J.B. Hunt's Leave Policy**

According to J.B. Hunt's written leave policy: "If an employee cannot return to work at the end of the FMLA leave because of the employee's incapacity and/or because no reasonable accommodation is available, [J.B. Hunt] may grant the employee a Personal Medical leave of up to 6 weeks." (Parrott Aff., Ex. 2, Johnson Dep., Ex. 2, J.B. Hunt Leave Policy at 7.) According to J.B. Hunt's 2009 Driver Manual, "Personal leave in excess of 6 weeks is not available." (Griffin Decl., Ex. 1, J.B. Hunt 2009 Driver Manual at 24.) Johnson received a copy of J.B. Hunt's leave policy, understood that he was entitled to a maximum of 18 weeks of leave, and was not aware of any employees receiving more than 18 weeks of leave. (Johnson Dep. 35-37, 139-40.) J.B. Hunt Litigation Director, Wesley Griffin, avers that J.B. Hunt's practice is that, if, at the end of the personal medical leave, the employee cannot return to his position within a reasonable period, J.B. Hunt discharges him, unless a position within his restrictions is available. (Griffin Decl. ¶ 8.) Also, "if the employee has presented a doctor's certification indicating that he or she will be able to return to work

within a reasonable time period, additional leave time may be granted." (Id.) Defendant claims that, if an injured employee's doctor cannot provide J.B. Hunt with an estimated return to work date, J.B. Hunt requires that the employee provide medical documentation every 30 days in order to continue their leave of absence.  (Parrott Aff., Ex. 2, Johnson Dep., Ex. 12.)

According to Defendant's 2009 Driver Manual, when a driver is out of work due to an injury, that employee cannot drive again until the Corporate Claims Department has received a release from the treating doctor that the driver can drive, load, and unload with no restrictions.  (J.B. Hunt 2009 Driver Manual at 71.)  Hill testified that claims specialists' practice is that, if a driver has restrictions that prevent him from performing the essential functions of a driver job, the claims specialist contacts the driver's supervisor and asks if the supervisor has any modified duty work at his location that may be performed by the driver within his restrictions.  (Hill Dep. 23-28.)  Hill testified that the decision of whether or not there is light duty work available for a restricted employee is left up entirely to the supervisor.  (Id. 26.)  She further testified that, under J.B. Hunt policy, light duty assignments may not exceed six months per injury.  (Id. 33-34.)

4

Light duty activities may include filing, sweeping, cleaning, answering phones, light warehouse work, and helping determine "what stops go on what routes." (Kitzer Decl., Henning Dep. 23, 114.)  A light duty assignment must fit the employee's injury-related work restrictions.  (Id.)

The supervisor does not follow any particular criteria in deciding if light duty work is available but is directed to "use the employee's restrictions as a guide."  (Hill Dep. 27-28; see also Henning Dep. 15, 21 (testifying that, if someone from the workers' compensation department asks him if he has light duty work available for an injured employee, he had discretion to determine whether light duty work is available to be given to an employee, but that he is not aware of any objective criteria to guide his determination).)  Henning, testified that he had never attempted to find light duty work for an employee when asked by the employee, as opposed to the workers' compensation department, nor has he ever advocated for light duty for an employee.  (Henning Dep. 16, 22, 82-83.  But see Henning Dep. 83-85; Kitzer Decl., Ex. A, Feb. 26, 2010 Email from Henning to Hill ("Do you know anything about getting Richard Tomlinson in for light duty? This guy really wants to stay here and recover so that he can get back to normal

duty.  We can certainly find work for him within his restrictions.  Any help you

can offer is greatly appreciated!").)

### 4.   **Johnson's First Injury**

Johnson was injured twice during his employment at J.B. Hunt.  (Johnson

Dep. 37.)  His first injury occurred on December 21, 2009, when he pulled a

muscle in his neck while delivering a refrigerator to a residential customer.

(Johnson Dep. 38-39; Kitzer Decl., Ex. L.)

Johnson reported his neck injury to Henning.  (Johnson Dep. 45-46.)

Henning arranged for Johnson to receive treatment at Now Occupational

Medical Clinic in Roseville.  (Id. 46-47.)  After diagnosing Johnson's neck injury,

a doctor recommended that Johnson undergo physical therapy.  (Johnson Dep.

46.)  The doctor also placed work restrictions on Johnson, including limitations

on pushing, pulling, lifting and carrying.  (Parrott Aff., Ex. 2, Johnson Dep., Ex.

4.)

Starting January 5, 2010, J.B. Hunt assigned Johnson a light duty position

to accommodate his work restrictions.  (Kitzer Decl., Ex. B.)  Hill testified that it

was Henning who determined whether there was a light duty position available

for Johnson after his first injury.  (Hill Dep. 85.)  Henning only recalls Johnson

being placed on light duty at some point.  (Henning Dep. 113.)  He remembers

Johnson doing office or warehouse work, but could not recall any other details.

(Id. 113-14.)

Johnson was approved to work without restrictions on February 2, 2010.

(Johnson Dep. 51-52; Parrott Aff., Ex. 2, Johnson Dep., Ex. 7.)  He returned to his

driver position on February 2 or 3, 2010. (Johnson Dep. 51-52.)  Johnson received

all workers' compensation benefits to which he was entitled for his first injury.

(Id. 51.)

### 5.    **Johnson's Second Injury**

Johnson reported a second work injury on August 25, 2010. (Hill Dep. 88;

Kitzer Decl., Ex. C; Johnson Dep. 56.)  Again, he was paid workers' compensation

benefits.  (Johnson Dep. 57.)  Johnson did not know the exact date that the injury

occurred because it was a shoulder strain that occurred over the course of time.

(Id. 56.)  Johnson reported the injury to Henning, who referred him to Roseville

Medical Center.  (Id. 57.)  On August 25th, 2010, the doctor diagnosed Johnson

with a shoulder strain and placed him on work restrictions.  (Id. 58.)

After Johnson's second injury, Henning said he would "get [him] into the

office for light duty work," and until then, he was to "stay at home."  (Johnson

Dep. 59-60.)  Henning recalled that Johnson suffered a second injury; however,

he could not recall doing anything to try to return Johnson to work after the

7

injury.  (Henning Dep. 115-16.)  Johnson claimed that Henning never called him

with any information relating to light duty work.  (Johnson Dep. 60.)  Johnson

was never returned to work.  (Id. 59.)

Hill could not remember if anyone discussed a potential modified or light

duty position with respect to Johnson's second injury.  (Hill Dep. 89.)

6.      **Leave after the Second Injury**

On August 26, 2010, J.B. Hunt placed Johnson on FMLA leave.  (Johnson

Dep. 60-61; Parrott Aff., Ex. 2, Johnson Dep., Ex. 11.)  While on leave, Johnson

was diagnosed with a rotator cuff and labrum tear.  (Johnson Dep. 62-63.)  He

underwent surgery for the tear on December 13, 2010.  (Id. 63-64.)  Following the

surgery, Johnson recalled being given work restrictions, limiting his right arm

and shoulder to minimal, or "table top" use.  (Id. 64.)

While Johnson was on leave for his second injury, Henning told driver

Richard Tomlinson, "Brad probably got hurt when four wheeling, and now he's

going to take it out on us."  (Tomlinson Decl. ¶ 4.)  Tomlinson claims that

Henning inquired whether Johnson was in a four-wheeling accident, and

Tomlinson replied that he did not know.  (Id.)  Henning testified that he vaguely

recalled Tomlinson telling him that Johnson had been in a four-wheeling

8

accident, but could not recall feeling suspicious that Johnson's injury was related to the accident.  (Henning Dep. 118-119.)

Tomlinson also avers that, following Johnson's second injury, he overheard Regional Safety Director Ron Schey tell Henning, "With everything happening to Brad, he is becoming a liability for J.B. Hunt."  (Tomlinson Decl. ¶ 3; Johnson Dep. 88, 98-100, 104-06.)  Henning agreed with Schey's comment. (Tomlinson Decl. ¶ 3.)

Johnson exhausted all available FMLA leave on approximately November 3, 2010.  (Johnson Dep. 68-69; Parrott Aff., Ex. 2, Johnson Dep., Ex. 12.)  He received workers' compensation throughout his FMLA leave.  (Johnson Dep. 65.)

On November 30, 2010, J.B. Hunt Benefits Service Representative Denise Myers sent a letter to Johnson indicating that he had been approved for six weeks of personal medical leave, effective November 4, 2010.  (Johnson Dep. 68-69; Parrott Aff., Ex. 2, Johnson Dep., Ex. 12.)  The additional six weeks were to expire on December 15, 2010.  (Id.)  The letter also indicated that if Johnson was unable to return to work prior to December 15, 2010, his employment with J.B. Hunt would end.  (Id.)

Myers wrote a second, November 30, 2010, letter to Johnson concerning his personal medical leave.  (Parrott Aff., Ex. 2, Johnson Dep., Ex. 12.)  Myers explained that J.B. Hunt received the initial doctor's certification required to approve Johnson's personal medical leave.  (Id.)  However, because Johnson's physician was unable to provide J.B. Hunt with an estimated return to work date, Myers instructed Johnson to complete and return a new certification, which was enclosed, before December 15, 2010.  (Id.)  Myers explained that in instances where J.B. Hunt does not have an estimated return to work date, the injured employee was required to send medical documentation every 30 days in order for the employee to continue his leave of absence.  (Id.)  The letter instructed that if the doctor's certification was not completed and received by December 15, 2010, Johnson's leave of absence would end and his employment with J.B. Hunt would be terminated.  (Id.)

Johnson claims that he telephoned Myers, and that Myers gave him an extension to the December 15, 2010 deadline on account of it taking the doctor's office "so long to do [the] forms."  (Johnson Dep. 73-76.)  According to Johnson, Myers stated that J.B. Hunt would grant an extension to his leave so long as he submitted the doctor's certification monthly.  (Id.)

Johnson submitted a doctor's certification requesting additional leave on or around December 30, 2010.  (Parrott Aff., Ex. 2, Johnson Dep., Ex. 13.)  The certification noted Johnson's December 13, 2010 surgery.  (Id.)  It also explained that the probable duration of his condition was "unknown" and that Johnson's work restrictions and return to work date would be reviewed "four to six weeks post-op 12/23."  (Id.)  The certification did not indicate an expected return-to-work date.  (Id.)

### 7.   **Termination**

On January 7, 2011, Johnson received a deposit in his checking account from J.B. Hunt.  (Johnson Dep. 79.)  He telephoned Hill to inquire about the deposit.  (Id.)  Hill told him that he had been terminated on December 16, 2010.  (Id.)  Johnson asked Hill about his conversation with Myers in which she had stated that an extension would be granted as long as his doctor filled out the certification each month.  (Id. 79-80.)  He claims that Hill told him that the extensions were not granted.  (Id.)  In contrast, Hill testified that it was not until she received notice of her deposition that she became aware of Johnson's termination.  (Hill Dep. 91.)

Henning testified that it was not his decision to terminate Johnson.  (Henning Dep. 125.)  He does not remember what department instructed him to

terminate Johnson, but surmises that he received instruction to terminate him.

(Id. 125-26.)  Sanders testified that he had nothing to do with the decision to

terminate Johnson.  (Sanders Dep. 27.)

Tomlinson testified that while Johnson was on leave after his second

injury, and shortly before his leave expired, Henning stated, "I can't wait to push

that button on Brad, it's so close."  (Tomlinson Decl. ¶ 1.)  After Johnson was

terminated, Henning bragged to Tomlinson, "Yep, I finally did it.  I pushed the

button on Brad."  (Id. ¶ 2.)  Henning testified that he sometimes used the phrase

"push the button" when he was told to terminate someone, but he denied having

used the term in relation to Johnson's termination.  (Henning Dep. 117-118).

Johnson has continued to suffer medical problems and, since December 13,

2010, has continuously been physically unable to perform the driver job.

(Johnson Dep. 108-09.)

### 8.   **Tomlinson**

Richard Tomlinson worked as a driver at J.B. Hunt's Roseville facility until

March 9, 2012.  (Kitzer Decl., Tomlinson Dep. 16, 20-21, 127.)  He has also

brought a lawsuit against J.B. Hunt for workers' compensation retaliation.

Tomlinson v. J.B. Hunt Transport, Inc., Civil File No. 12-2030 (MJD/TNL).  He

filed two workers' compensation claims after two work-related injuries at J.B.

Hunt.  (Tomlinson Dep. 30-31).  After Tomlinson's first injury, Henning sought

light duty work for him.   (Kitzer Decl., Ex. A; Kitzer Decl., Ex. F.)  On February

26, 2010, Henning contacted Hill and wrote:

> Do you know anything about getting Richard Tomlinson in for light duty?  This guy really wants to stay here and recover so that he can get back to normal duty.  We can certainly find work for him within his restrictions.
>
> Any help you can offer is greatly appreciated.

(Kitzer Decl., Ex. A.)

In a March 21, 2011 email from Henning to Henning's manager, Justin

Thomas, Henning wrote:

> Gary [Tomlinson] is coming up on the date that he needs to be employed or he loses his unemployment.  The date is 4/2.  He has received a couple of offers from outside the company, but really doesn't want to leave.  Is there any chance that we get that position through before 4/2?  I'd be the first one to tell you that we don't need the B.S. immediately, but we will, and I don't want to lose Gary in the mean time.  Can you think of any alternatives?  Any where else we could put him in the mean time?  Would he perhaps be able to drive for dray?
>
> I know this is a tough spot, but Gary has taken care of this location and J.B. Hunt as a company in the past.  He's not milking his WC.  He wants back to work in a bad way and he wants to be productive, too.  He doesn't want to continue to leach off the company.

(Kitzer Decl., Ex. F.)

After Tomlinson's first injury, J.B. Hunt allowed him to work on light duty for approximately ten months, beyond the stated six-month cap on light duty work.  (Henning Dep. 92; Tomlinson Dep. 93-94; Kitzer Decl., Exs. G-H.)  He was only removed from light duty once he reached maximum medical improvement, rendering him ineligible for light duty.  (Hill Dep. 50.)  Hill testified that Tomlinson's working in excess of the six-month maximum was the result of a clerical error.  (Id. 37.)

Tomlinson testified that, after his injury, Henning complained that he had to pay $20,000 out of his budget because of Tomlinson's workers' compensation injury.  (Tomlinson Dep. 112-13.)  Henning made these complaints multiple times.  (Id. 113.)  He made these comments about every employee who got injured at work.  (Id. 114.)

Also after Tomlinson's first injury, Henning told Tomlinson that if he did not get his lawyer and qualified rehabilitation consultant ("QRC") "to back off it would not go well for [Tomlinson]."  (Tomlinson Dep. 219, 225.)  When Tomlinson asked him to explain, Henning repeated the warning: "if you don't get your lawyer and QRC to back off on trying to put more liability on J.B. Hunt, it's not going to go well for you, Justin and Gabe are getting tired of it."  (Id.)

After Tomlinson's second injury, Henning did not attempt to find

Tomlinson light duty work.  (Henning Dep. 82).  In regard to the second injury,

Tomlinson claimed that Henning told him, "I hope this is part of the first injury

so you don't cost me another $20,000."  (Tomlinson Dep. 220.)

J.B. Hunt never allowed Tomlinson to return to work after his second

injury and terminated him on March 9, 2012.  (Tomlinson Dep. 119.)  On

approximately March 25, 2012, Tomlinson returned to J.B. Hunt's Roseville

facility to clean out his truck.  (Tomlinson Dep. 227.)  He told Henning, "I guess

since I didn't get my lawyer and QRC to back off it didn't go well for me."  (Id.

219-20.)  Henning responded, "[Y]ep, I guess."  (Id. 220.)

### B.     Procedural Background

On July 31, 2012, Johnson commenced an action against J.B. Hunt in

Minnesota State Court, Ramsey County.  On August 20, 2010, J.B. Hunt removed

the matter to this Court based on diversity jurisdiction.

On September 12, 2012, Johnson filed an Amended Complaint alleging

Count 1: Workers' Compensation Retaliation in violation of Minnesota Statute §

176.82.  [Docket No. 6]

J.B. Hunt now moves for summary judgment on the claim against it.

Johnson moves to strike the Declaration of Wesley Griffin.

## III.   DISCUSSION

### A.   Motion to Strike Declaration of Wesley Griffin

Johnson moves to strike the declaration of Wesley Griffin, submitted by

Defendant in support of its Motion for Summary Judgment.

#### 1.   Facts Related to the Griffin Declaration

On May 31, 2013, J.B. Hunt filed a declaration by Wesley Griffin, its

Litigation Director.  [Docket No. 33]  The Griffin Declaration contains

background information regarding J.B. Hunt's policies and procedures.  Griffin

also avers that Schey "had no role in the decision to terminate Mr. Johnson's

employment, nor into any decision whether to provide him with a light duty

work assignment."  (Griffin Decl. ¶ 11.)  Griffin attaches portions of the J.B. Hunt

2009 Driver Manual, the J.B. Hunt Drivers & Installers Manual for Whirlpool,

and the Injury Investigation Report regarding Johnson's December 2009 injury as

exhibits to his declaration.

Johnson asserts that Griffin was never identified as a person with any

knowledge about the case in Defendant's Rule 26(a) Disclosures, in response to

written discovery asking Defendant to identify all persons with information

relating to the allegations in the lawsuit, in any depositions, or at any point

before the Motion for Summary Judgment was filed.  (Rochel Decl., Exs. 1-3.)

Plaintiff also asserts that Griffin's declaration includes documents as exhibits that were never produced in discovery.  Plaintiff asserts that he has been denied the opportunity to use those documents during his depositions of other witnesses.

Defendant admits that it did not include Griffin in its Rule 26(a) disclosure of "Names of Individuals Likely to Have Discoverable Information."  (Rochel Decl., Ex. 1.)  However, Griffin verified J.B. Hunt's responses to Johnson's interrogatories on January 31, 2013.  (Rochel Decl., Ex. 2.)  And, in response to Interrogatory No. 1, asking J.B. Hunt to identify each person who provided information, was consulted, or participated in the preparation of the answers to the Interrogatories, J.B. Hunt "refers to the verification page" signed by Griffin and identifying him as "Director of Claims Administration for J.B. Hunt."  (Id.) Defendant concludes that Johnson was on notice that Griffin had relevant information about the topics in the interrogatory responses, including J.B. Hunt's operations, policies, and practices – the same topics addressed in the Griffin Declaration.  However, Johnson did not attempt to depose Griffin.  (Parrott Decl. ¶ 3.)

2.    **Legal Standard**

Federal Rule of Civil Procedure 26(a)(1)(A)(i) requires a party to provide to the other parties: "the name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  Parties also have a continuing duty to supplement or correct all Rule 26(a) disclosures, interrogatory responses and requests for production if their responses are either incomplete or incorrect, "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1).

Rule 37 states that a party who fails to provide information or identify witnesses as required under Rule 26(a) or fails to supplement as required under Rule 26(e)(1) "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  "Rule 37 does not provide for mandatory sanctions, and the district court may find that a party's failure to include a witness in the initial Rule 26(a)(1) disclosures was substantially justified or harmless."  Davis v. U.S. Bancorp, 383 F.3d 761, 765 (8th Cir. 2004).

18

When a party fails to provide information or identify a witness in compliance with Rule 26(a) or (e), the district court has wide discretion to fashion a remedy or sanction as appropriate for the particular circumstances of the case. The district court may exclude the information or testimony as a self-executing sanction unless the party's failure to comply is substantially justified or harmless. When fashioning a remedy, the district court should consider, inter alia, the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony.

Wegener v. Johnson, 527 F.3d 687, 692 (8th Cir. 2008) (citations omitted).

###   3.   Analysis of the Alleged Failure to Disclose Griffin as a Witness

Johnson had notice of Griffin's knowledge of Defendant's policies, procedures, and documents and of Defendant's institutional knowledge of which employees participated in the decision to terminate Johnson based on the January 31, 2013 interrogatory response and verification. See Brown v. Chertoff, No. 406CV002, 2009 WL 50163, at *5-6 (S.D. Ga. Jan. 7, 2009) (holding declarants were sufficiently revealed when, in response to interrogatories, party wrote that the two declarants "provided the information necessary to answer this interrogatory"), aff'd 380 Fed. App'x 832 (11th Cir. 2010). There is no requirement to supplement if the information was otherwise made known to the opposing party during the discovery process. Fed. R. Civ. P. 26(e)(1). Thus,

Plaintiff's motion to strike Griffin's declaration based on the failure to disclose is denied.

4.      **Analysis of Alleged Failure to Disclose the Exhibits to the Griffin Declaration**

Defendant admits that, as a result of a clerical error, it did not produce the 2009 J.B. Hunt Driver Manual or the J.B. Hunt Drivers & Installers Manual for Whirlpool in this case, but points out that it did produce both documents in the companion case to this matter, Tomlinson v. J.B. Hunt Transport, Inc., Civil File No. 12-2030 (MJD/TNL), and Johnson also produced the 2009 J.B. Hunt Driver Manual in this case.  (Parrott Decl. ¶¶ 4-7).  Thus, the exhibits were known to Plaintiff because one was produced by Plaintiff himself and the other was produced in the Tomlinson case.  There is no evidence of prejudice here.  See, e.g., King v. Reed, LLC, Civ. No. 07–1908 (DWF/RLE), 2008 WL 7514360, at *3 (D. Minn. Oct. 6, 2008) (denying motion to exclude expert report because its "untimely production" was "effectively mollified by the fact that, independently, the same report was produced by another party").  The motion to strike certain exhibits to Griffin's declaration is denied.

5.      **Foundation**

20

Johnson also asserts that the declaration should be stricken because it lacks foundation.  In Griffin's declaration, Griffin explains that, as Litigation Director for J.B. Hunt, he has personal knowledge of its operations, corporate structure, and related issues.  (Griffin Decl. ¶ 1.)  Plaintiff has presented no evidence to show that Griffin lacks foundation to provide the opinions that he did.  Griffin avers that he has personal knowledge of J.B. Hunt's policies based on his position within the company, so foundation has been established.  Plaintiff's motion to strike Griffin's declaration based on lack of foundation is denied.

### B.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

C.     **Workers' Compensation Retaliation**

1.     **Standard for Workers' Compensation Retaliation**

Minnesota Statute § 176.82, subdivision 1, provides:

> Any person discharging or threatening to discharge an employee for
> seeking workers' compensation benefits or in any manner
> intentionally obstructing an employee seeking workers'
> compensation benefits is liable in a civil action for damages incurred
> by the employee . . . .

2.     **Direct Evidence and <u>McDonnell Douglas</u> Standards**

The parties debate whether the Court should apply the direct evidence

standard of analysis or the <u>McDonnell Douglas</u> standard of analysis to Plaintiff's

workers' compensation claim.  The Court need not resolve the question because,

under either method of analysis, Plaintiff's claim survives summary judgment.

a.     **Direct Evidence Standard**

"Direct evidence is evidence showing a specific link between the alleged

discriminatory animus and the challenged decision, sufficient to support a

finding by a reasonable fact finder that an illegitimate criterion actually

motivated the adverse employment action."  <u>King v. United States</u>, 553 F.3d 1156,

1160 (8th Cir. 2009) (citation omitted).  Direct evidences includes "evidence of

actions or remarks of the employer that reflect a discriminatory attitude,

comments which demonstrate a discriminatory animus in the decisional process,

or comments uttered by individuals closely involved in employment decisions."

Id. at 1161 (citation omitted).  "[S]tray remarks in the workplace, statements by

nondecisionmakers, and statements by decisionmakers unrelated to the

decisional process do not constitute direct evidence."  Id. at 1160 (citations

omitted).

**b.   McDonnell Douglas Standard**

A workers' compensation retaliation claim is generally analyzed under the

McDonnell Douglas burden-shifting test.  See Randall v. N. Milk Prods., Inc., 519

N.W.2d 456, 459 (Minn. Ct. App. 1994).  "A prima facie case of retaliatory

discharge under Minnesota law consists of: (1) statutorily-protected conduct by

the employee; (2) adverse employment action by the employer; and (3) a causal

connection between the two."  Kunferman v. Ford Motor Co., 112 F.3d 962, 965

(8th Cir. 1997) (citation omitted).  For the purposes of this motion, the parties

agree that Johnson engaged in protected conduct by seeking workers'

compensation benefits and suffered an adverse employment action when he was

terminated.  Only the causation prong remains at issue.

If the plaintiff establishes the prima facie case,

the burden of production then shifts to the employer to articulate a
legitimate reason for the discharge; and [] if the employer articulates
a legitimate reason, the burden of production shifts back to the

> plaintiff to show pretext and the factfinder must determine whether
> the illegitimate reason (i.e., seeking workers' compensation benefits)
> was more likely than not the reason for discharge.

Benson v. Northwest Airlines, Inc., 561 N.W.2d 530, 539 (Minn. Ct. App. 1997)

(citation omitted).

### 3.  **Analysis**

Viewing the evidence in the light most favorable to Plaintiff, there is

sufficient evidence of discriminatory animus, whether the claim is viewed under

the direct evidence standard or through the lens of causation and pretext under

the McDonnell Douglas standard.  Henning was Johnson's supervisor, and

Tomlinson testified that, while Johnson was on leave, Henning stated that he

could not wait to "push the button" on Johnson, and, after Johnson was

terminated, Henning bragged that he had "pushed the button" on him.

Although Henning denies making the termination decision, Defendant offers no

evidence of who did make that decision.  Based on this record, a reasonable jury

could conclude that Henning was involved in the decision to terminate Johnson.

There is evidence that, after Johnson's second workers' compensation

claim, Henning agreed with Schey's comment that Johnson was becoming a

liability for J.B. Hunt.  These comments are admissible statements by a party

opponent – Schey's and Henning's statements were made during their

employment and related to their jobs as supervisors.  Also, the statements are

relevant because there is evidence that Henning made the decision to fire

Johnson, and Henning agreed with Schey's statement.

There is also evidence that Henning asserted that Johnson's workers'

compensation claim was actually based on an out-of-work four-wheeling

accident and that Johnson was trying to "take it out on [Defendant]."  Also, as

noted above, while Johnson was on leave after his second injury, Henning stated

that he could not wait to fire him and, after Johnson was terminated, Henning

bragged that he had finally fired him.  This evidence is sufficient to support a

finding that Henning based the decision to terminate Johnson on discriminatory

animus.

Moreover, Johnson points to evidence that Tomlinson was also fired after

making his second workers' compensation claim.  See Estes v. Dick Smith Ford,

Inc., 856 F.2d 1097, 1103 (8th Cir. 1988) (noting that "unflattering testimony about

the employer's history and work practices" "may be critical for the jury's

assessment of whether a given employer was more likely than not to have acted

from an unlawful motive"), overruled in part on other grounds by Price

Waterhouse v. Hopkins, 490 U.S. 228 (1989).  Here, Henning was the supervisor

for both Johnson and Tomlinson, so evidence of Henning's comments about Tomlinson are "probative of [Defendant's] intent to discriminate." <u>Goldsmith v. Bagby Elevator Co., Inc.</u>, 513 F.3d 1261, 1286 (11th Cir. 2008).  Thus, Johnson's claim is further supported by evidence that, for example, Henning made comments such as complaining about the $20,000 coming out of his budget because of Tomlinson's workers' compensation injury; he told Tomlinson to have his workers' compensation lawyer and QRC "back off" and threatened that it would not go well for Tomlinson if he disobeyed; and after Tomlinson was fired, Henning agreed that it did not go well for Tomlinson because Tomlinson failed to get his lawyer and QRC to "back off."

    4.   **Pretext**

Although Defendant has set forth a legitimate reason for Johnson's termination – that it terminated Johnson because he had exhausted all available leave allowed under Defendant's leave policies and had no expected return-to-work date – Johnson has presented sufficient evidence to show pretext.

> An employee may prove pretext by demonstrating that the employer's proffered reason has no basis in fact, that the employee received a favorable review shortly before he was terminated, that similarly situated employees who did not engage in the protected activity were treated more leniently, that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies.

Stallings v. Hussmann Corp., 447 F.3d 1041, 1052 (8th Cir. 2006) (citations omitted).

The evidence Johnson presented in support of the causation prong and in support of the direct analysis also supports a finding of pretext.  Moreover, the fact that J.B. Hunt fails to identify the person responsible for terminating Johnson is strong evidence of pretext.  Henning testified that it was not his decision to terminate Johnson, but he does not remember who did instruct him to terminate Johnson.  Sanders testified that he had nothing to do with the decision to terminate Johnson.  Although Johnson testified that Hill informed him of his termination, Hill testified that she was not even aware of his termination until she received notice of her deposition in this lawsuit.  In response to discovery from Plaintiff, J.B. Hunt has failed to identify any person responsible for the decision to terminate him.  "A jury could reasonably determine that [plaintiff's] supervisors' game of 'hot potato' was an attempt to dissemble for discrimination."  Zacharias v. Guardsmark, LLC, Civ. No. 12–174 (RHK/FLN), 2013 WL 136240, at *6 (D. Minn. Jan. 10, 2013).

Additionally, viewing the evidence in the light most favorable to Johnson, J.B. Hunt applied its leave policy inconsistently to similarly situated individuals,

which could be interpreted as evidence of pretext.  Defendant allowed Johnson to do light duty work after his first workers' compensation claim, but offered him no light duty work after his second claim, despite Henning's statement that he would get light duty work for him.  Although Henning testified that he had never attempted to find light duty work at an employee's request, the February 26, 2010, and March 21, 2011, emails from Henning demonstrates that Henning did, in the past, advocate for finding light duty work for an injured employee. There is a fact question regarding whether Defendant granted Johnson an extension to the deadline for submitting paperwork for additional leave and promised that, so long as he submitted a certification each month, his leave would be extended.  Henning and Hill also admitted that Tomlinson was previously allowed to stay on light duty beyond the six-month limitation after his first injury, which demonstrates that the termination policy was not strictly enforced.   Overall, the record reflects a genuine issue of fact regarding whether J.B. Hunt terminated Johnson in retaliation for his filing of his second workers' compensation claim.

  **D.**  **Workers' Compensation Continued Employment Claim**

    1.  **Standard for Workers' Compensation Continued Employment Claim**

Minnesota Statute § 176.82, subdivision 2, provides:

> An employer who, without reasonable cause, refuses to offer continued employment to its employee when employment is available within the employee's physical limitations shall be liable in a civil action for one year's wages. . . . In determining the availability of employment, the continuance in business of the employer shall be considered and written rules promulgated by the employer with respect to seniority or the provisions o[f] any collective bargaining agreement shall govern.

2.   **Analysis**

Plaintiff argues that J.B. Hunt violated subdivision 2 because it failed to provide him light work after his second injury.  He asserts that the jury can find that J.B. Hunt could have provided him with a light duty work position after his second injury as it had after his first injury and as it had for Tomlinson after his first injury.   Johnson does not argue that there were any particular light duty positions within J.B. Hunt for which he should have been hired.  Rather, he argues that J.B. Hunt is liable because it made no effort to find light duty work for him in general.

Defendant argues that it is Plaintiff's burden to prove that a light duty position existed in December 2010 that was available to him within his physical limitations.  See Johnson v. Otter Tail Cnty., No. Civ. A. 98-2237(RLE), 2000 WL 1229854, at *18 (D. Minn. July 24, 2000), aff'd 2001 WL 664217 (8th Cir. June 14,

2001).  Defendant concludes that, because Johnson has not identified a particular

available position for which he was qualified, his claim fails.

The Court denies summary judgment on the continued employment

aspect of Plaintiff's workers' compensation claim.  This case is unusual in that

Defendant admittedly created short-term light duty positions for injured

employees and had done so for Tomlinson and Johnson in the past.  These are

not pre-existing job openings.  Rather, viewing the evidence in the light most

favorable to Johnson, Henning invented positions out of whole cloth if he wished

to keep a particular driver employed.  Additionally, Defendant admits that there

is no clear policy regarding who will be given light duty, when light duty work

is available, or the responsibilities of any light duty job.  And, here, none of

Defendant's employees will admit to remembering any discussion or decision

regarding denying light duty work to Johnson after his second injury, let alone

explain their reasoning.  Under these circumstances, combined with the

previously discussed evidence supporting Plaintiff's subdivision 1 claim, there is

sufficient evidence to permit this claim to continue to trial.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

1.  Defendant's Motion for Summary Judgment [Docket No. 31] is
    **DENIED**.

2.  Plaintiff's Motion to Strike Declaration of Wesley Griffin [Docket
    No. 42] is **DENIED**.


Dated:  December 19, 2013          s/ Michael J. Davis
                                   Michael J. Davis
                                   Chief Judge
                                   United States District Court